51 P.3d 366

CHILD SUPPORT ENFORCEMENT AGENCY, State of Hawai'i, Petitioner/Plaintiff–Appellee and Respondent/Plaintiff–Appellee,

v.

Jane DOE, Respondent/Defendant–Appellant,

and

Jane Roe and John Roe, Respondents/Defendants–Appellees and Petitioners/Defendants–Appellees.

No. 23053.

Supreme Court of Hawai'i.

Aug. 9, 2002.

Rosemary McShare and Trina Yamada, Deputies Corporation Counsel, on the writ, for petitioners/plaintiff-appellee and respondent/plaintiff-appellee Child Support Enforcement Agency, State of Hawai'i.

Laurent J. Remillard, Jr. and John C. McLaren, Honolulu (of Park Park Yu & Remillard), on the writ, for petitioners/defendants–appellees and respondents/defendants-appellees Jane Roe and John Roe.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by MOON, C.J.

Petitioner/plaintiff-appellee Child Support Enforcement Agency, State of Hawai'i (CSEA), and petitioners/defendants-appellees Jane Roe (Mother) and Lloyd Y. Asato, Special Administrator for the Estate of John Roe (Putative Father) [hereinafter, Mother and Asato are collectively referred to as the Estate], each timely filed an application for writ of certiorari asking this court to review the opinion of the Intermediate Court of Appeals (ICA) in *Child Support Enforcement Agency v. Doe*, 99 Hawai'i 138, 53 P.3d 277 (App. 2002) (ICA Op.). In their respective petitions, both CSEA and the Estate contend, *inter alia*, that the ICA erred when it: (1) construed the motion filed by respondent/defendant-appellant Jane Doe [hereinafter, Grandmother] pursuant to Hawai'i Family Court Rules (HFCR) Rules 60(b)(2) and 60(b)(3) (1982) as a timely motion filed under HFCR Rule 60(b)(6) (1982); and, (2) thereafter, vacated the family court's order denying Grandmother's motion. We granted certiorari as to both petitions. Because we agree with the petitioners and because the issue is dispositive of this case, we vacate the ICA's decision.

## I. BACKGROUND

### A. Family and Probate Court Proceedings

On August 23, 1996, Putative Father died as a result of injuries he sustained in a motor vehicle accident on the island of Hawai'i. On November 18, 1996, Mother gave birth to a child (Daughter) in Honolulu. CSEA filed a petition for paternity in the Family Court of the First Circuit on July 2, 1997, seeking to establish that Putative Father was Daughter's biological father and requesting that custody of Daughter be granted to Mother. The petition named as defendants Mother, Putative Father, and Grandmother, who was alleged in the petition to be Putative Father's mother and the "executor" of Putative Father's estate.

Although Grandmother was identified as the executor of the estate in the petition, Grandmother's ability to represent Putative Father's estate ultimately was more limited. On July 22, 1997, the Third Circuit Court appointed Grandmother special administrator of Putative Father's estate for the sole purpose of prosecuting a wrongful death action and receiving settlement funds in connection with the automobile accident that caused Putative Father's death.

On August 1, 1997, Grandmother appeared with counsel at a hearing in the first circuit family court in response to the paternity petition.[1] The parties agreed that genetic tests would be conducted, if possible, to determine the paternity issue. Although blood and tissue samples were readily available from Mother and Daughter, it was not known at the time of the hearing whether any body tissue or fluids from Putative Father existed. Therefore, it was agreed that CSEA would be responsible for attempting to locate samples that may have been taken from Putative Father following the August 23, 1996 automobile accident. The family court later filed a "(Stipulated) Order Regarding Genetic Testing[,]" which ordered, among other things, that: (1) if available, tissue samples of Putative Father be genetically tested; (2) Mother and Daughter submit to genetic testing; and (3) the results of the testing and the computation of probability statistics "shall be received into evidence at the trial ... without the need to lay a foundation, subject to the reservation by any party to call witnesses regarding the weight of evidence to be assigned or the procedures employed in conducting said tests."

Subsequently, a blood sample from Putative Father was reportedly located and held by Hilo Hospital, and the parties stipulated that the blood sample of Putative Father "shall be released to Laboratory Corporation of America, Inc. [[hereinafter, LabCorp]] for the previously ordered genetic testing[.]" The blood sample was transported to LabCorp, which is located in North Carolina, "by

---

1. There is no evidence in the record to suggest that Grandmother's counsel at the hearing, who did not represent Grandmother in the probate proceeding, was aware of the limited nature of Grandmother's appointment.

courier[.]" The test results were accompanied by a sworn affidavit of LabCorp's Associate Director, an expert in genetic testing, attesting to personal knowledge of the fact that the results reported represented those of the sample that was delivered. There is no other documentation in the record concerning the chain of custody. The test results indicated that the "probability of paternity" for Putative Father was 99.96%, with a "combined paternity index" of 2542 to 1.[2]

At a December 4, 1997 hearing held after the genetic test results were obtained, Mother identified Putative Father as the father of Daughter, and Grandmother, through her attorney, represented that "[t]he estate no longer contests the question of paternity." Consequently, the family court adjudicated Putative Father as the father of Daughter; final judgment was entered December 9, 1997.

Approximately eight months later, in August 1998, the First Circuit Court appointed Asato as Special Guardian of the Property of Daughter for the purpose of investigating and preserving any potential claims on her behalf arising from Putative Father's death. Asato later filed a motion in the Third Circuit Court, seeking to remove Grandmother from her role as a special administrator of Putative Father's estate. Following contested proceedings and a hearing that was attended by Grandmother on October 8, 1999, the Third Circuit Court apparently removed Grandmother as special administrator and replaced her with Asato.[3]

On October 19, 1999, eleven days after Grandmother was replaced by Asato as special administrator of the estate and over twenty-two months after the family court had adjudicated Putative Father as the legal father of Daughter, Grandmother, appearing *pro se*, filed a motion in the first circuit family court to set aside the paternity judgment, pursuant to HFCR Rules 60(b)(2) and 60(b)(3).[4] HFCR Rule 60(b) provides in relevant part:

> On motion and upon such terms as are just, the court may relieve a party or his [or her] legal representative from any or all of the provisions of a final decree, order, or proceeding for the following reasons: ... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(d)(2); [or] (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.... The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the decree.

Attached to Grandmother's motion was, *inter alia*, an affidavit in which she claimed to be the appointed legal representative of Putative Father's estate. In support of her motion, Grandmother also attached a copy of an August 1999 newspaper article that referred to a well-publicized criminal case. The article stated that "people familiar with the case" had reported that a tissue sample had been taken from Putative Father following his death, apparently as part of the investigation into the crime. The article reported that "[a]n expert [had] testified only that tissue from a cadaver—she didn't say whose—had been obtained but that it couldn't be tested because it had been ruined by the formaldehyde used to preserve it."

---

**2.** The term "combined paternity index" has been defined as the "[l]ikelihood that the alleged father (or a man that is genetically identical to the alleged father) contributed the paternal genes to a child, divided by the likelihood that another unrelated man of the same race contributed the paternal genes." 1 N. Vitek, *Disputed Paternity Proceedings* at 13–104 (5th ed.1997).

**3.** The foregoing information was obtained from the proposed order which Asato submitted to the Third Circuit Court after the court apparently orally ruled in his favor. The order was attached to the Estate's memorandum in opposition to Grandmother's motion and attested to by counsel for the Estate. Grandmother did not dispute this information during the subsequent proceedings before the family court and acknowledged Asato's status when she served him with her reply brief on appeal.

**4.** Grandmother's motion actually stated that it was filed pursuant to the HFCR, Hawai'i Rules of Civil Procedure, Rules of the Circuit Courts, and the Federal Rules of Civil Procedure. The motion expressly identified clauses (2) and (3) of Rule 60(b). Because Grandmother filed her motion in family court, the motion is properly considered as brought pursuant to the HFCR.

As a result of the statements in the article that tissue from a cadaver that was possibly Putative Father was not available for testing in the criminal case, Grandmother tried to ascertain the source of the blood sample used by the laboratory to determine that Putative Father was the biological father of Daughter. Although mostly unauthenticated evidence, various attachments to Grandmother's motion attempted to document her investigation. For example, Hilo Hospital records indicated that a blood sample from Putative Father had been sent to the Chemical Toxicology Institute (CTI), located in California, on August 29, 1996, for a comprehensive drug screen. Also attached to Grandmother's motion was a letter she had written to the Director of CTI, in which Grandmother writes that "I spoke with your assistant, Robert Tores[,]" and that "Mr. Tores recalls that the 'blood specimen' [that presumably was sent to CTI by Hilo Hospital] was destroyed in May 1997[,]" prior to the paternity proceedings later that year. A letter from the Medical Records Department at Hilo Hospital indicated that there were no records regarding Putative Father dated after August 1996. Grandmother further ascertained that the police department and the medical examiner did not possess blood or tissue samples from Putative Father. Based on the above information, Grandmother argued in her motion that, because of "newly discovered evidence[,]" the previous paternity judgment should be set aside and further discovery and a full trial be permitted.

In memoranda opposing Grandmother's motion, the Estate and CSEA each asserted, *inter alia*, that Grandmother's motion was untimely and based upon inadmissible evidence.[5] At the October 28, 1999 hearing on the motion, CSEA reasserted its argument that Grandmother's motion was untimely and characterized Grandmother's evidence as "hearsay, double hearsay, mostly innuendo,

[and] mostly unsubstantiated." CSEA also argued that the paternity judgment was a validly obtained judgment and that Grandmother's motive in attempting to reopen it was to influence ongoing probate and criminal cases. CSEA further offered to submit its "chain of custody" of the blood sample to the court for *in camera* review and, if the court deemed it necessary, to perform genetic testing on Grandmother and Grandfather. Grandmother, through counsel that she had subsequently retained, asserted that "fraud" had occurred, suggesting that CSEA had lied during the 1997 proceedings in order to induce her to agree to the judgment of paternity. The family court ended argument by indicating that it was not necessary to consider whether the genetic test results were obtained by fraud. The court reasoned that, inasmuch as Mother had testified that Putative Father was the father of Daughter, there was sufficient independent evidence to support the paternity judgment irrespective of the genetic test results. Consequently, the family court denied Grandmother's motion. The final order was entered on November 22, 1999, and Grandmother timely appealed.

### B. *ICA Proceedings*

On appeal, assigned to the ICA, Grandmother essentially argued that she had submitted sufficient evidence to suggest that Hilo Hospital and LabCorp did not have a blood sample from Putative Father to test during the original paternity proceedings and that Mother's testimony alone was insufficient to establish Putative Father's paternity. The Estate and CSEA contended that Grandmother's HFCR Rule 60(b) motion was untimely.[6]

▮ The ICA agreed that Grandmother's motion was timed-barred under clauses (2) and (3) of HFCR Rule 60(b) because Grandmother had not filed the motion within one

---

5. The Estate also asserted that on several occasions, Grandmother had violated an order of the family court by knowingly failing to send Mother notice of ongoing probate proceedings in the third circuit court and that Grandmother had misrepresented to the probate court that she and her husband (Grandfather) were the sole heirs to Putative Father's estate. Consequently, the Estate contended that Grandmother was precluded

from seeking equitable relief from the paternity judgment. Given our disposition on the grounds herein, we need not address this contention.

6. CSEA and the Estate raised several other issues which are not necessary to address given our disposition on the jurisdictional grounds herein.

year of the entry of the underlying paternity judgment. *See* ICA Op. at 99 Hawai'i at 148, 53 P.3d at 287. However, the ICA further reasoned that, "[w]here a party cites the wrong rule in bringing a motion or fails to cite any rule at all, ... it is common for courts to treat the motion as being brought pursuant to the appropriate rule." *Id.* at 148, 53 P.3d at 287. Relying upon *United States v. Deutsch,* 981 F.2d 299 (7th Cir. 1992), and *Wilson v. Al McCord, Inc.,* 858 F.2d 1469 (10th Cir.1988), which address how courts should handle an ambiguously-worded post-trial "motion for reconsideration" that could constitute either a Federal Rules of Civil Procedure (FRCP) Rule 59(e) or FRCP Rule 60(b) motion, the ICA reasoned that it is the timing of the litigant's post-trial motion that determines the label to be attached to the motion.[7] *See* ICA Op. at 148–149, 53 P.3d at 287–288. HFCR Rule 60(b)(6) permits a court to grant relief "for any other reason justifying relief from the operation of the judgment" and need only be brought within a "reasonable" time rather than within one year of the judgment. Consequently, the ICA held that, "although Grandmother's motion to set aside the [p]aternity [j]udgment pursuant to HFCR Rule 60(b)(2) and (3) was time-barred, the motion may be considered has having been properly brought pursuant to clause (6) of HFCR Rule 60(b)." ICA Op. at 150, 53 P.3d at 289. The ICA concluded that the family court had "implicitly considered" Grandmother's motion as a HFCR Rule 60(b)(6) motion by disposing of her claim on "substantive, rather than procedural, grounds." *Id.* at 150, 53 P.3d at 289.

The ICA then proceeded to examine the family court's decision that, even if no blood sample from Putative Father existed and the genetic test results had to be disregarded, Mother's testimony was, by itself, sufficient to establish Putative Father's paternity. *Id.* at 155, 53 P.3d at 294.[8] The ICA held that, because "Putative Father was deceased and unable to defend himself, Mother's uncorroborated and conclusory statement was, by itself, insufficient as a matter of law, to establish Putative Father's paternity." *Id.* at 157, 53 P.3d at 296. Consequently, the ICA vacated the family court's order and remanded the case for further proceedings. *Id.* at 157, 53 P.3d at 296. Both CSEA and the Estate timely sought a writ of certiorari in this court, which we granted on June 7, 2002.

## II. *STANDARDS OF REVIEW*

### A. *Writ of Certiorari*

In deciding whether to grant a petition for certiorari, this court reviews ICA decisions for (1) grave errors of law or of fact, or (2) obvious inconsistencies in the decision of the ICA with that of the supreme court, federal decisions or its own decision and the magnitude of such errors or inconsistencies dictates the need for further appeal. *See* Hawai'i Revised Statutes (HRS) § 602–59(b) (1993). The acceptance or denial of a petition by this court is discretionary. *See* HRS § 602–59(a).

### B. *HFCR Rule 60(b)*

A motion to set aside a judgment pursuant to HFCR Rule 60(b) is reviewed for abuse of discretion. *Hayashi v. Hayashi,* 4 Haw.App. 286, 290, 666 P.2d 171, 174 (1983). The timeliness of a motion brought pursuant to HFCR Rule 60(b) implicates the jurisdiction of the family court. *See Nucor Corp. v. Nebraska Public Power District,* 999 F.2d 372, 376, *reh'g denied,* 999 F.2d 372 (8th

---

7. FRCP Rule 59 permits motions for a new trial or for amendment of judgment if filed within ten days of entry of judgment and is similar to HFCR Rule 59. FRCP Rule 60(b) is also similar to HFCR Rule 60(b). Where, as with HFCR Rule 60(b), an HFCR is patterned after an equivalent rule within the FRCP, interpretations of the rule by the federal courts are deemed to be persuasive by Hawai'i appellate courts. *Hayashi v. Hayashi,* 4 Haw.App. 286, 290 n. 6, 666 P.2d 171, 174 n. 6; *see also Molinar v. Schweizer,* 95 Hawai'i

331, 336, 22 P.3d 978, 983 (2001) (interpretation of FRCP by federal courts is persuasive authority for Hawai'i courts in their interpretation of HRCP).

8. Before doing so, the ICA also examined whether it was permissible to bring a paternity action against a deceased Putative Father in the first place and concluded that it was. *See* ICA Op. at 150–154, 53 P.3d at 289–293.

Cir.1993); *Deutsch,* 981 F.2d at 302; *Nevitt v. United States,* 886 F.2d 1187, 1188 (9th Cir.1989); *cf. Doe v. Doe,* 98 Hawai'i 144, 150, 44 P.3d 1085, 1091 (Haw.2002) (discussing the family court's "jurisdiction" to consider a timely HFCR Rule 59(e) motion); *see generally Koolauloa Welfare Rights Group v. Chang,* 65 Haw. 341, 343, 652 P.2d 185, 187 (1982) (trial court had "no power" to modify a "mistake" in a judgment pursuant to HRCP Rule 60(b)(1) where more than one year had elapsed).

## III. *DISCUSSION*

■ The Estate and CSEA contend that the ICA erred in construing Grandmother's motion, which was brought pursuant to HFCR Rules 60(b)(2) and (3), as a HFCR Rule 60(b)(6) motion. Both petitioners point out that, in order to'qualify for relief under HFCR Rule 60(b)(6), the motion must be based upon some reason other than those stated in clauses (1) through (5). We agree.

In *Hayashi,* the ICA noted that, in order to obtain relief pursuant to HFCR Rule 60(b)(6), the movant must show, *inter alia,* that the motion asserts some ground for relief other than those specifically stated in clauses (b)(1) through (b)(5). *See Hayashi,* 4 Haw.App. at 290, 666 P.2d at 174. Hawai'i appellate courts have held similarly with respect to the analogous Hawai'i Rules of Civil Procedure (HRCP) Rule 60(b)(6). *See Hawaii Housing Authority v. Uyehara,* 77 Hawai'i 144, 148–49, 883 P.2d 65, 69–70 (1994); *Citicorp Mortgage, Inc. v. Bartolome,* 94 Hawai'i 422, 437–38, 16 P.3d 827, 842–43 (App. 2000); *Dillingham Inv. Corp. v. Kunio Yokoyama Trust,* 8 Haw.App. 226, 235, 797 P.2d 1316, 1320 (1990).

■ In this case, Grandmother identified her motion as being brought pursuant to HFCR Rule 60(b)(2) and (b)(3). In addition, Grandmother clearly sought relief based on "newly discovered evidence" in the form of a newspaper article which she believed demonstrated that Putative Father could not have been the source of the blood sample tested by the laboratory. Such an assertion un-equivocally sought relief pursuant to HFCR Rule 60(b)(2). Alternatively, by questioning the chain of custody of the blood sample, Grandmother's motion suggested that "fraud" occurred. Clause (3) of HFCR Rule 60(b) "applies to situations in which a judgment is procured by illegitimate means employed in the litigation ...." *Citicorp Mortgage,* 94 Hawai'i at 437, 16 P.3d at 842. Indeed, Grandmother's attorney expressly stated that the grounds for relief was that "fraud" had occurred, suggesting that CSEA's counsel had lied during the underlying proceedings in order to induce Grandmother to agree to the judgment of paternity. A claim for relief based upon such an assertion clearly falls within the purview of HFCR Rule 60(b)(3). Because Grandmother's asserted grounds for relief unmistakably were based upon circumstances specified in one or more of clauses (1) through (5) of HFCR Rule 60(b), Grandmother's motion cannot, as a matter of law, be construed as a HFCR Rule 60(b)(6) motion. To hold otherwise would be to permit parties to circumvent a failure to timely appeal or move to set aside a judgment. *See generally Citicorp Mortgage,* 94 Hawai'i at 437–38, 16 P.3d at 842–43.

*Deutsch,* as persuasive authority, also illustrates the ICA's error in this case. In *Deutsch,* the appellant filed a "motion for reconsideration" of a judgment approximately two years after entry of the judgment. *Deutsch,* 981 F.2d at 300.[9] The United States Court of Appeals for the Seventh Circuit reasoned that, because the appellant's motion was made more than ten days after entry of judgment, it was properly characterized as a motion brought pursuant to FRCP Rule 60(b) rather than FRCP Rule 59. *See id.* at 300–01. The court then determined that the grounds for relief asserted fell under either clause (1) or clause (3) of FRCP Rule 60(b) and, because the motion was not filed within one year of the underlying judgment, held that the federal district court did not have jurisdiction to consider it. *Deutsch,* 981 F.2d at 302.

In this case, the specific grounds stated in Grandmother's motion, which was filed near-

---

9. The "judgment" in *Deutsch* was actually a final appealable order. *Id.* The difference is immate-rial to our analysis.

ly two years after the underlying judgment, unambiguously sought the substantive relief described in clauses (2) and (3) of HFCR Rule 60(b). We, therefore, hold that Grandmother's motion is time-barred. Accordingly, the family court did not have jurisdiction to consider Grandmother's motion and the ICA should not have addressed the issues that it did.

## IV. *CONCLUSION*

Based on the foregoing, we vacate the ICA decision in its entirety and the family court's order denying Grandmother's motion. We remand the case to the family court with instructions to dismiss Grandmother's motion.