**Electronically Filed
Intermediate Court of Appeals
CAAP-19-0000711
29-SEP-2020
07:47 AM**

NO. CAAP-19-0000711

IN THE INTERMEDIATE COURT OF APPEALS
OF THE STATE OF HAWAI'I

IN THE INTEREST OF AA

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 16-00249)

MEMORANDUM OPINION
(By:  Leonard, Presiding Judge, Chan and Hiraoka, JJ.)

This appeal arises from a proceeding under the Hawai'i
Child Protective Act, Hawaii Revised Statutes (**HRS**) Chapter 587A.
Appellant **AM** appeals from the "Decision and Order Regarding the
Contested Hearing on [AM]'s Motion to Set Aside Default Filed
June 5, 2019[,]" (**Decision & Order**) entered by the Family Court
of the First Circuit[1] on September 20, 2019.  We affirm the
Decision & Order.

BACKGROUND

**Child** was born in a Honolulu hospital on November 30,
2016.  On December 2, 2016, Child's mother (**Mother**) told hospital
staff she did not feel safe going home because of domestic
violence by her boyfriend; she wanted Child placed into foster
care.  Mother was then interviewed by a social worker.  Mother
said she lived with her boyfriend "John" and other of her family

---

[1]    The Honorable Bode A. Uale presided.

members.  She reported domestic violence by the boyfriend, and stated that the boyfriend was not Child's father and did not know Mother was pregnant.  Mother refused to go to a domestic violence shelter and wanted Child to go into foster care.  Child was taken into protective custody and placed with **Resource Caregivers** licensed by the Hawaiʻi Department of Human Services (**DHS**).

On December 7, 2016, DHS filed a petition to take temporary foster custody of Child under HRS §§ 571-11(9)[2] and 587A-5,[3] initiating the Child Protective Act proceeding below. The petition named Mother; the name of Child's natural father was stated as "Unknown."

On December 9, 2016, Mother attended the family court hearing on the petition with court-appointed counsel.  Mother stipulated to Child being placed in foster custody.  A per diem district family court judge awarded foster custody to DHS, ordered a service plan for Child, and set a further hearing for March 2, 2017.

---

[2]     On December 7, 2016, HRS § 571-11 provided, in relevant part:

Except as otherwise provided in this chapter, the [family] court shall have exclusive original jurisdiction in proceedings:

. . . .

(9)    For the protection of any child under chapter 587A[.]

[3]     On December 7, 2016, HRS § 587A-5 provided, in relevant part:

Pursuant to section 571-11(9), the [family] court shall have exclusive original jurisdiction:

(1)    In a child protective proceeding concerning any child who is or was found within the State at the time specified facts and circumstances occurred, are discovered, or are reported to the department [of human services]. These facts and circumstances constitute the basis for the court's finding that the child's physical or psychological health or welfare is subject to imminent harm, has been harmed, or is subject to threatened harm by the acts or omissions of the child's family[.]

Mother failed to appear at the March 2, 2017 hearing, and was defaulted.  Circuit family court judge Bode A. Uale (**Judge Uale**) granted DHS's oral motion for leave to serve Child's natural father by publication.  A written order granting the motion was entered on March 2, 2017.  Summons for Child's natural father was published in the Honolulu Star-Advertiser on April 10, 17, 24, and May 1, 2017, with a return date of June 21, 2017.  No one appeared for the return; Judge Uale entered the default of Child's natural father on June 21, 2017.

Mother appeared by telephone at a further hearing conducted on September 11, 2017.  Judge Uale set aside Mother's default, prospectively, without setting aside any previous orders.

On February 21, 2018, DHS filed a motion to terminate parental rights.  The motion was heard on February 27, 2018.  Mother did not appear at the hearing.  Judge Uale again entered Mother's default and granted DHS's motion, terminating the parental rights of Mother and the then-unknown natural father.  Letters of permanent custody were issued to DHS.  Child was 15 months old at the time.

Judge Uale conducted a review hearing on August 14, 2018.  Child was 21 months old.  Judge Uale approved adoption as the proper permanency plan.  However, on October 23, 2018 (one month before Child's second birthday), DHS filed a motion for immediate review of Child's case.  DHS had received an email from AM on October 9, 2018.  AM believed he was Child's natural father, and "inquired about how he could begin the process of legally bringing [Child] home."  The motion was given a hearing date of December 6, 2018.

Meanwhile, on November 5, 2018, AM filed a petition for paternity with the family court, naming Mother and DHS as respondents (**Paternity Action**).

At the December 6, 2018 hearing on DHS's motion for immediate review, Judge Uale ordered that AM "do a genetic test

as arranged & paid for by DHS if it is not done by [the Hawaiʻi Child Support Enforcement Agency] as part of their process[.]" The hearing on DHS's motion was continued to January 29, 2019.

On January 28, 2019, AM filed a motion to intervene in the Child Protective Act case. The motion, signed by AM's attorney, stated that it was based on "the agreements reached with the parties in [AM]'s related petition in [the Paternity Action]" and AM's "understanding and belief that this motion is unopposed." AM re-filed the motion on February 11, 2019, including a notice of hearing for March 25, 2019.

On February 22, 2019, AM was adjudicated to be Child's natural father.

Judge Uale conducted the hearing on March 25, 2019. Child was 2 years, 4 months old. Counsel for DHS reported that Child had been with Resource Caregivers for over two years, and was doing well in their home. Judge Uale stated:

> Now, as to your motion, [counsel for AM], I'm going to set it for trial. As I explained to you in the prehearing conference, this is a -- this is a very -- it's going to be a difficult case for your client because of the fact of the passage of time and where the child has been placed almost three years and then your client appears. ***So it's not only about your client. It's also about the safety, welfare, and well-being of the child.*** So I cannot give you an automatic intervention in this case, but I am going to set it for trial. I'm going to set it for trial April 22nd -- excuse me, May 7th at 8:30. Pretrial conference will be April 22nd at 9:30. . . .
>
>     . . . .
>
> [AM'S COUNSEL]: Just for the -- so I'm clear, on the trial, is the court granting our motion to intervene so --
>
> THE COURT: No.
>
> [AM'S COUNSEL]: -- we're having a trial on -- on the --
>
> THE COURT: The trial is on whether I'm going to allow [AM] to intervene in this case.
>
> [AM'S COUNSEL]: All right.
>
> THE COURT: So your motion to intervene is the subject of the trial.

> [AM'S COUNSEL]:  And I take it the issues are going to be the -- the objections raised in the short report from the [Court Appointed Special Advocates Program] and whatever that's in the permanency plan?
>
> THE COURT:  Well, ***the standard is always best interest of the child*** so --
>
> [AM'S COUNSEL]:  Yes.
>
> THE COURT:  -- you might want to go on that.  Based on all of the things that have happened, it's almost three years this child has been in -- in care.  As far as why your client took so long, bring it up at trial.  I'm not going to hear anything today.

(Emphasis added.)  Judge Uale entered a written order setting AM's motion to intervene for trial on May 7, 2019, with a pretrial conference set for April 22, 2019.

The April 22, 2019 pretrial conference was conducted by a per diem district family court judge.  DHS and Child's guardian ad litem informed the family court that they had no objection to AM's motion to intervene.  The per diem judge stated:

> Well, here's the thing, right.  The May 7th date, if no one's going to put up a fight, then I don't see the need to keep a contested hearing on the calendar when it's going to just eat up a court slot.  So I guess if everyone's in agreement, [AM]'s got his own counsel privately, then by stipulation, with no objection of the parties, [AM]'s motion to -- [AM]'s motion to intervene in the proceedings will be granted.  He'll be made a party to the case.  He shall be noticed through counsel on all matters and papers regarding this case.
>
> And vacate the May 7th hearing date --
>
> . . . .
>
> [COUNSEL FOR COURT APPOINTED SPECIAL ADVOCATES PROGRAM]:  I -- I'm sorry.  Your Honor, I think we just -- we just wanted clarification, if the motion to intervene, if it starts now or from the very beginning of the case (indiscernible).
>
> THE COURT:  Well -- okay, it's granted and you're made a party to the case prospectively.  So from here on out, you're noticed on all matters.

The per diem judge entered an order granting AM's motion to intervene.  The order also stated: "All prior consistent orders shall remain in full force and effect until further order of the

Court[.]"  All parties were ordered to appear at a further hearing on June 18, 2019.

On May 14, 2019, Resource Caregivers filed their own motion to intervene in the Child Protective Act case.  AM opposed the motion.  Judge Uale heard the motion on May 22, 2019.  Judge Uale informed the parties:

> THE COURT:  Okay, and I guess [AM] has been made a party by stipulation.  So I'm going to make you a party because I don't believe that stipulation was appropriate because I -- you folks sent the stipulation to me, and I returned it because I told you folks I wouldn't sign it, and then when I was gone, I understand the per diem judge that was sitting signed off on the stipulation.  The problem is is you have -- you have a termination of parental rights so you have to set that aside first in order for your client to intervene.  So as far as I'm concerned, that stipulation is void, because ***in order for you to come into the case, since you're saying that your client is the biological father, I think legally you have to set aside the prior court order of termination of parental rights***.  So I don't know how you want to deal with this.  I'm certainly happy to give you a trial.  But I don't think that stipulation was appropriate just . . . legally.
>
> . . . .
>
> So I'm ready to tell you first I'm setting aside the stipulation to allow [AM] to intervene because I don't think that was appropriate.  It's not the per diem judge's fault.  I wasn't here.  I was on some kind of leave.  And I do think that you have a right, but I think ***you need to file an appropriate motion to set aside default citing the appropriate law in order to have that***.  So I'm going to allow you to do that, but I'm also going to give you a pretrial and a trial date in order to have that come across.
>
> . . . .
>
> And so, [AM's counsel], you need to file a written motion to -- to set aside default, citing the appropriate law.  And then I'm going to set it for these dates.

(Emphasis added.)  A written order granting Resource Caregivers' motion to intervene and setting aside the order granting AM's intervention was entered on May 29, 2019.  Trial was set for July 29, 2019, with a pretrial conference on June 26, 2019.

AM filed a "Motion to Set Aside Default" on June 5, 2019.  Resource Caregivers filed a memorandum in opposition.  AM filed a supplemental memorandum in support of his motion.  Judge

Uale conducted an evidentiary hearing on AM's motion on July 29, 2019. The hearing could not be completed by the end of the day, and was continued to August 27, 2019. The parties thereafter submitted written closing arguments.

The Decision & Order denying AM's motion was entered on September 20, 2019. AM filed a timely notice of appeal. The family court entered findings of fact and conclusions of law pursuant to Rule 52(a) of the Hawaiʻi Family Court Rules (**HFCR**) on November 19, 2019. Child's third birthday occurred less than two weeks thereafter.

## DISCUSSION

AM challenges several of the family court's findings of fact and conclusions of law. AM contends: **(1)** the family court erred in concluding that AM was duly served by publication; **(2)** the family court erred in not setting aside the entry of AM's default and the termination of AM's parental rights by default; and **(3)** the denial of AM's motion to intervene deprived AM of his constitutional right to due process.

### 1. Service by publication was proper.

The Hawaiʻi Child Protective Act "creates within the jurisdiction of the family court a child protective act to make paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm." HRS § 587A-2 (Supp. 2016). The statutory provisions are to be "liberally construed to serve the best interests of the children affected and the purpose and policies set forth herein." Id.

Service of summons in Child Protective Act cases is governed by HRS § 587A-13 (Supp. 2016). The statute provides, in relevant part:

> (a)  After a petition has been filed, the court shall issue a summons requiring the presence of the parents[.]

. . . .

(c)     The sheriff or other authorized person shall serve the summons by personally delivering a certified copy to the person or legal entity being summoned. . . . [P]rovided that:

. . . .

(2)     If the court finds that it is impracticable[4] to personally serve the summons, the court may order service by . . . publication . . . .  When publication is used, the summons shall be published once a week for four consecutive weeks in a newspaper of general circulation in the county in which the party was last known to have resided.  In the order for publication of the summons, the court shall designate the publishing newspaper and shall set the date of the last publication at no less than twenty-one days before the return date.  Such publication shall have the same force and effect as personal service of the summons.

DHS orally moved for leave to serve Child's then-unknown father by publication during a hearing on March 2, 2017.  The family court granted the motion.  AM contends that DHS did not establish, nor did the family court find, that it was "impracticable" to personally serve the then-unknown father.  AM challenges the following findings of fact:

16.     Mother informed DHS that the child's father was in Chuuk but did not provide the name of the biological father to DHS or any contact information for the biological father.

. . . .

19.     Throughout the duration of the case prior to termination of parental rights, Mother did not maintain contact with the DHS; she did not provide DHS with any further information about the identity or location of the child's father; she did not provide DHS with any further information about the identity or location of the boyfriend that she claimed was abusing her; she did not attend any supervised visits; and she did not show any interest in reunifying with [Child] or engaging in any services offered by the DHS to address the safety concerns of her home.

---

4     "Impracticable" means "incapable of being performed or accomplished by the means employed or at command."  Impracticable, Merriam-Webster, https://www.merriam-webster.com/dictionary/impracticable (last updated Aug. 29, 2020).

> Mother was represented by appointed counsel throughout the case.
>
> 20. In April and May of 2017, based upon Mother's failure/refusal to provide any information regarding the identity of [Child]'s father, the DHS published notice to the Unknown Natural Father of [Child].
>
> 21. On June 21, 2017, the Unknown Natural Father of [Child] was defaulted by the Court in consequence of his failure to appear on the date provided in the publication.
>
> 22. At that time, the DHS remained unaware of any additional information regarding [Child]'s father.
>
> 23. Due to the continuing lack of knowledge regarding the identity or whereabouts of [Child]'s natural father and Mother's failure to engage in services, maintain contact with the DHS and parents' inability to provide [Child] with a safe family home, on February 21, 2018, the DHS filed a Motion to Terminate Parental Rights.
>
> . . . .
>
> 112. During the period between November of 2016 and April of 2018, [AM] knew or should have known that legal proceedings were going forward regarding [Child].

AM does not challenge the following findings of fact, which are binding upon him and this court:

> 14. After [Child] was born and was still in the hospital, Mother claimed to DHS that she did not feel safe to return home because of domestic abuse by her current boyfriend, whom she identified as "John."
>
> . . . .
>
> 18. On March 2, 2017, Mother was defaulted as a consequence of her failure to appear for a scheduled hearing.

The family court's findings of fact are reviewed under the "clearly erroneous" standard. Fisher v. Fisher, 111 Hawaiʻi 41, 46, 137 P.3d 355, 360 (2006). A finding of fact is clearly erroneous when the record lacks substantial evidence to support the finding, or despite substantial evidence in support of the finding, we are nonetheless left with a definite and firm conviction that a mistake has been made. Id. "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Id. In this case, the challenged findings

of fact are all supported by substantial evidence in the record, and we are not left with a definite or firm conviction that a mistake has been made.

AM challenges the following conclusions of law:

> 6.    This Court has jurisdiction over this family and [Child] pursuant to the provisions of The Child Protective Act.
>
> 7.    Based upon Mother's failure to provide any information regarding the identity or other means to locate [Child]'s father, the DHS published notice to an Unknown Natural Father pursuant to Rule 17(d)(2), Hawaii Family Court Rules, which states:
>
> > [T]he person intended shall thereupon be considered a party defendant to the action, as having notice of the institution of the action against that person, and as sufficiently described for all purposes, including service of process, and the action shall proceed against that person.
>
> 8.    [AM] was duly noticed and served by this publication and the entry of default and subsequent termination of his parental rights upon his failure to appear based upon this notice was appropriate.

The family court's conclusions of law are ordinarily reviewed de novo, under the right/wrong standard, "and are freely reviewable for their correctness." Fisher, 111 Hawaiʻi at 46, 137 P.3d at 360 (citation omitted). However, when a conclusion of law presents mixed questions of fact and law, we review it under the "clearly erroneous" standard because the court's conclusions are dependent on the facts and circumstances of each individual case. Estate of Klink ex rel. Klink v. State, 113 Hawaiʻi 332, 351, 152 P.3d 504, 523 (2007). A conclusion of law that is supported by the trial court's findings of fact and reflects an application of the correct rule of law will not be overturned. Id.

In this case, when DHS served Child's then-unknown father by publication, the only information DHS had about Child's father had been provided by Mother, who "stated that baby's father is in Chuuk and that he wants child to go into foster care." Mother appeared at the December 9, 2016 hearing on DHS's

petition with counsel, who stated, "[s]he does not know who the father is."  Mother did not appear at the March 2, 2017 hearing, when DHS orally moved for leave to serve by publication.

AM incorrectly contends that DHS knew, before March 2, 2017, that Child's father's name was "John."  The record shows that Mother identified her boyfriend, whom she stated was not Child's father, as "John."  It was not until Mother signed a declaration on June 5, 2019, (more than two years later) that she identified "someone named John" as the person with whom she had a sexual encounter in Chuuk, who she originally thought was Child's father.

The Hawaiʻi Supreme Court has held:

> [R]esort to constructive service by publication is predi-
> cated upon necessity, and, if personal service could be
> effected by the exercise of reasonable diligence, sub-
> stituted service is unauthorized. . . . The test, however,
> is not whether it was in fact possible to effect personal
> service in a given case, but whether the complainant
> reasonably employed knowledge at [their] command, made
> diligent inquiry, and exerted an honest and conscientious
> effort appropriate to the circumstances, to acquire the
> information necessary to enable [them] to effect personal
> service on the defendant.

Murphy v. Murphy, 55 Haw. 34, 35, 514 P.2d 865, 867 (1973) (cleaned up) (citation omitted).  We hold that the challenged conclusions of law were supported by the family court's findings of fact, and reflect an application of the correct rule of law.

AM argues that publication was defective.  We disagree. The record shows that summons for Child's natural father was published in the Honolulu Star-Advertiser on April 10, 17, 24, and May 1, 2017, with a return date of June 21, 2017.  The publication — 4 consecutive weeks, with a return date more than 21 days after the last publication date — complied with HRS § 587A-13.  AM's contention that "he does not regularly read newspapers" is irrelevant because the Star-Advertiser is "a newspaper of general circulation" in Honolulu, where AM lives.

AM argues that publication should have been made in Chuuk, where Mother said Child's father lived. We disagree. AM, who was later determined to be Child's natural father, did not live in Chuuk. AM lived in Honolulu. We hold that summons was properly served upon AM by publication in the Honolulu Star-Advertiser.

> **2.    The family court did not err by declining to set aside the entry of AM's default and the <u>termination of AM's parental rights by default.</u>**

The family court's Decision & Order was entered on September 20, 2019. At that time, a party seeking to set aside an entry of default was required to satisfy the three-prong test set forth in <u>BDM, Inc. v. Sageco, Inc.</u>, 57 Haw. 73, 549 P.2d 1147 (1976), <u>abrogated by</u> <u>Chen v. Mah</u>, 146 Hawaiʻi 157, 457 P.3d 796 (2020). <u>See</u> <u>Chen</u>, 146 Hawaiʻi at 177, 457 P.3d at 816 (noting that before January 30, 2020, party seeking to set aside entry of default pursuant to HRCP Rule 55(c) must satisfy three-prong <u>BDM</u> test for Hawaiʻi Rules of Civil Procedure (**HRCP**) Rule 60(b) motions). That standard also applied to the identical language of the HFCR. <u>Id.</u> at 177 n.21, 457 P.3d at 816 n.21.

HFCR Rule 55 states, in relevant part:

> **(c) Setting aside default.** For good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b) of these rules.

HFCR Rule 60 states, in relevant part:

> **(b)    Mistakes; inadvertence; excusable neglect; newly discovered evidence; fraud.** On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from any or all of the provisions of a final judgment, order, or proceeding for the following reasons:
>
> (1)    mistake, inadvertence, surprise, or excusable neglect;
>
> (2)    newly discovered evidence which by due diligence could not have been discovered in time to move for a new

12

trial under Rule 59(b) of these rules or to reconsider, alter, or amend under Rule 59(e);

(3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or

(6) any other reason justifying relief from the operation of the judgment.

The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceedings was entered or taken.

AM's default was entered pursuant to HFCR Rule 55. AM's parental rights were terminated while he was in default, making the termination of parental rights a default judgment. See In re Doe, 77 Hawaiʻi 109, 114, 883 P.2d 30, 35 (1994) (holding that "an infringement upon parental custody rights is an appealable decision even though the requisite finality normally required for appeals is lacking."). Accordingly, AM was required to obtain relief under both HFCR Rule 55 and HFCR Rule 60(b). AM had the burden of establishing that: (1) Child will not be prejudiced by the reopening; (2) AM has a meritorious defense; and (3) AM's default was not the result of inexcusable neglect or a wilful act. Chen, 146 Hawaiʻi at 173-74, 457 P.3d at 812-13.

The family court made the following findings of fact:

12. On December 2, 2016, the DHS assumed placement responsibility of [Child] via police protective custody because of Threat of Abuse and Threat of Neglect.

13. [Child]'s Date of Entry into Foster Care was December 9, 2016.

14. After [Child] was born and was still in the hospital, Mother claimed to DHS that she did not feel safe to return home because of domestic abuse by her current boyfriend, whom she identified as "John."

15. Mother refused to enter a domestic violence shelter and requested that [Child] be placed in foster care.

16.    Mother informed DHS that the child's father was in Chuuk but did not provide the name of the biological father to DHS or any contact information for the biological father.

17.    On December 9, 2016, an initial temporary foster custody return hearing took place and at that hearing Mother appeared with counsel and voluntarily stipulated to foster custody, adjudication of the Petition, the jurisdiction of the Court and the Family Service Plan, dated December 6, 2016.

18.    On March 2, 2017, Mother was defaulted as a consequence of her failure to appear for a scheduled hearing.

19.    Throughout the duration of the case prior to termination of parental rights, Mother did not maintain contact with the DHS; she did not provide DHS with any further information about the identity or location of the child's father; she did not provide DHS with any further information about the identity or location of the boyfriend that she claimed was abusing her; she did not attend any supervised visits; and she did not show any interest in reunifying with [Child] or engaging in any services offered by the DHS to address the safety concerns of her home. Mother was represented by appointed counsel throughout the case.

20.    In April and May of 2017, based upon Mother's failure/refusal to provide any information regarding the identity of [Child]'s father, the DHS published notice to the Unknown Natural Father of [Child].

21.    On June 21, 2017, the Unknown Natural Father of [Child] was defaulted by the Court in consequence of his failure to appear on the date provided in the publication.

22.    At that time, the DHS remained unaware of any additional information regarding [Child]'s father.

. . . .

24.    On February 27, 2018, the parental rights of [Child]'s parents were terminated.

. . . .

35.    [AM]'s Motion to Set Aside Default was filed on June 5, 2019, more than one year after the entry of the Entry of Default on June 21, 2017, and more than one year after [AM]'s parental rights had been terminated on February 27, 2018.

. . . .

42.    [Child] was placed with [Resource Caregivers] on December 2, 2016[,] and has been continuously in their care since that time.

. . . .

14

49.    [Resource Caregivers] wish to adopt [Child] and have filed their own Petition for Adoption in FC-A No. 19-1-6097.

. . . .

50.    During the hearing [on AM's motion to set aside default] the Court received testimony from [AM], Mother, and DHS social worker, Lena Kakehi.

51.    All parties stipulated that DHS social worker Lena Kakehi was an expert with regard to child protective services and child welfare services and she was so qualified by the Court.

. . . .

59.    Mother claimed to Ms. Kakehi that she did not know the identity of [Child]'s father.

. . . .

64.    Ms. Kakehi testified that in her opinion the fact that Mother lied about events pertinent to this case and [Child]'s safety constituted a safety concern regarding her ability to be protective and provide a safe home for [Child].

65.    Ms. Kakehi testified that in her opinion the fact that Mother did not participate in any services constituted a safety concern regarding her ability to provide a safe home for [Child] and showed a lack of commitment to the child.

66.    Ms. Kakehi testified that in her opinion the fact that Mother's parental rights had been terminated without any appeal on Mother's part constituted a safety concern regarding her ability to provide a safe home for [Child].

67.    Mother's relationship with [AM] has continued to the present day and it is their plan that Mother would be the primary caretaker for [Child] should Father's default be set aside.

68.    Ms. Kakehi testified that in her opinion Mother and [AM] would not presently be able to provide a safe family home for [Child].

69.    The testimony of Ms. Kakehi was credible.

70.    Mother and [AM] are presently not able or willing to provide a safe family home for [Child], even with the assistance of services and would not be able to do so within the reasonably foreseeable future.

. . . .

73.    Mother testified that after she left Hawaii and went to Chuuk on March 25, 2016, she met a man at a store, and two days later had sexual relations with him.  She said

15

that the sex was consensual. She also testified that she met the man in Hawaii and knew him for three days while he was in Hawaii. She testified that she did not know the man's last name and knew him only as "John." Mother testified at one time that she thought "John" was the only possible father for [Child] and at other times she testified that she was not sure whether the father was "John" or [AM].

. . . .

76. Mother admitted that after she was discharged from [the hospital] after the birth of [Child], she was transferred to the psychiatric ward at Castle Hospital, where she stayed for four days.

. . . .

78. After she was discharged from the Castle psychiatric ward Mother lived in her car for a period of time because she did not want to return to [AM].

. . . .

80. In December of 2016, after Mother returned to [AM], he found the medical records of her discharge from [the hospital] and was aware that she had given birth during the time that she was in [the hospital].

. . . .

83. Based upon the Court's observation of Mother's demeanor and the contradictory testimony that she gave during the trial, Mother's testimony was not credible.

84. Mother's stated reasons for not telling [AM] of her pregnancy are not credible.

85. Mother's stated reasons for allegedly hiding her pregnancy from [AM] are not credible.

86. Mother's stated reasons for hiding [Child]'s birth from [AM] are not credible.

87. Mother's claim that there was no domestic violence in her relationship with [AM] is not credible.

. . . .

96. Mother went to Chuuk shortly after she became pregnant with [Child] and did not return to Hawaii until approximately one month before [Child] was born.

97. [AM] and Mother lived together after she returned to Hawaii from Chuuk.

98. [AM] testified that he was not aware that Mother was pregnant during the month preceding [Child]'s birth claiming she did not look that big and also claiming that he did not see her without her clothes on during that period.

99. [AM] claims that he does not remember if he and Mother had sex during that period but said that if they did, they did not utilize the "missionary" position so he would not have noticed her pregnancy.

100. [AM]'s testimony that he did not know of Mother's pregnancy before she gave birth was not credible.

101. [AM]'s testimony that he did not have intimate relations with Mother after she returned to Hawaii is not credible.

102. [AM]'s claim that he does not remember if he saw Mother without her clothes on during that period is not credible.

103. [AM] testified that he first became aware that Mother had given birth to [Child] during the month of December 2016 when he found records from [the hospital] in her car.

104. [AM] claims that he did not at that time perform any calculation to determine if he was possibly the father of [Child].

. . . .

106. [AM]'s claim that he did not perform any calculation to determine if he was possibly the father of [Child] is not credible.

107. As of December 2016, when [AM] became aware of [Child]'s birth and the date of [Child's] birth[,] [AM] knew or reasonably should have known that he was a possible father of [Child].

108. [AM] claimed that Mother did not tell him anything about any court proceedings.

109. [AM] claimed that he did not know anything about adoption proceedings and said that as far as he knew the child had been adopted by that time.

. . . .

111. [AM]'s testimony that he did [not] know anything about adoption proceedings is not credible. . . .

112. During the period between November of 2016 and April of 2018, [AM] knew or should have known that legal proceedings were going forward regarding [Child].

. . . .

117. [AM] claimed that the only person that Mother had dealt with regarding [Child] was DHS social worker Linda Kakehi when in fact Mother also had court-appointed counsel who represented her throughout the [Child Protective Act] proceeding.

118. No explanation was offered for their failure to contact Mother's court-appointed counsel.

119. [AM] claimed that he and Mother went to the DHS office where Ms. Kakehi worked every three weeks from the end of May 2018 to early October of 2018 without ever making contact with Ms. Kakehi.

120. No explanation was offered for their failure during this period to call Ms. Kakehi on her direct line or to send her an email since they also had her email address.

121. No explanation was offered for their failure to find out the name of Ms. Kakehi's supervisor or contact someone else at the DHS regarding the status of [Child]'s case.

. . . .

127. Based upon his claimed education and business experience, [AM]'s delay in consulting with or retaining the services of an attorney was not reasonable.

128. No explanation was offered for [AM'S] failure to file a motion seeking to set aside the default before June 5, 2019.

129. The delay in filing a motion to set aside the default was not reasonable.

130. [AM] did not appeal the termination of his parental rights.

131. [AM] knew or should have known that [Child] was his child since December of 2016, and it was a consequence of his own inexcusable inaction that the Motion to Set Aside Default was not filed until June 5, 2019.

132. Based upon the Court's observation of [AM]'s demeanor and the contradictory testimony that he gave during the trial, [AM]'s testimony was not credible.

133. [Child] has been in foster care with [Resource Caregivers] for almost 3 full years.

134. [Child] has no significant relationship with [AM] at this point.

135. [Child] has no significant relationship with Mother at this point.

136. [Child] has been thriving in the care of [Resource Caregivers] and is bonded to them as they are bonded to him.

137. [Child] deserves permanency at this point.

. . . .

> 141.  It would be extremely prejudicial and harmful to [Child] to remain any longer in the foster care system without providing [Child] with closure and permanency.
>
> 142.  It is not in [Child]'s best interests for permanency to be delayed in light of all the delays that have occurred during this case so far.

These findings of fact were supported by substantial evidence in the record.  In addition, "[i]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of evidence; this is the province of the trier of fact."  Fisher, 111 Hawai'i at 46, 137 P.3d at 360 (citation omitted).

The family court entered the following conclusions of law, some of which are actually mixed questions of fact and law:

> 6.    This Court has jurisdiction over this family and [Child] pursuant to the provisions of The Child Protective Act.
>
> 7.    Based upon Mother's failure to provide any information regarding the identity or other means to locate [Child]'s father, the DHS published notice to an Unknown Natural Father pursuant to Rule 17(d)(2), Hawaii Family Court Rules[.] . . .
>
> 8.    [AM] was duly noticed and served by this publication and the entry of default and subsequent termination of his parental rights upon his failure to appear based upon this notice was appropriate.
>
> . . . .
>
> 11.    The Court is without jurisdiction to consider a motion based upon Rule 60(b)(1), (2), or (3), Hawaii Family Court Rules, if the motion is made more than one year after the entry of the order being challenged. Child Support Enforcement Agency v. Doe, 98 Haw. 499, 51 P.3d 366[](2002).
>
> 12.    Since the Motion to Set Aside Default filed by [AM] herein was filed more than one year after the entry of default against [AM] and more than one year after the entry of the order terminating his parental rights, this Court does not have jurisdiction to entertain a motion relating to either of those orders based upon Rule 60(b)(1), (2), or (3), Hawaii Family Court Rules.
>
> 13.    Rules 60(b)(4) and (5), Hawaii Family Court Rules, are not applicable to the facts of this case.

14. Relief pursuant to Rule 60(b)(6) is extraordinary and the movant must show: (1) that the motion is based on some reason other than those specifically stated in subdivisions (1) through (5); (2) the reason is such to justify the relief; and (3) that the motion is made within a reasonable time. Hayashi v. Hayashi, 4 Haw. App. 286, 666 P.2d 171 (1983); In re: RBG, 123 Haw. 1, 229 P.3d 1066 (2010).

15. Any of [AM]'s claims that are based upon reasons that fall within Rules 60(b)(1), (2), or (3) may not be asserted as a reason to justify relief under Rule 60(b)(6).

16. [AM] claimed that the fact that he is [Child]'s birth father was a sufficient reason for the Court to grant relief under Rule 60(b)(6).

17. The fact that [AM] is [Child]'s birth father, in and of itself, is not a reason to justify relief under Rule 60[(]b)(6), Hawaii Family Court Rules. Quilloin v. Walcott, 434 U.S. 246 (1978); Caban v. Mohammed, 441 U.S. 380 (1979); and with Lehr v. Robertson, 463 U.S. 248 (1983)[.]

18. [AM] has no meaningful or substantial relationship with [Child].

19. In the absence of any evidence of a meaningful or substantial relationship between [AM] and [Child], the fact that he is [Child]'s birth father is not a reason to justify relief under Rule 60(b)(6), Hawaii Family Court Rules. In re: I.S., 2007 Haw. App. Lexis 675 (App. 2007).

20. [AM] claimed that the fact that [Resource Caregivers] are Caucasian and [Child] is not is a sufficient reason for the Court to grant relief under Rule 60(b)(6).

21. The fact that [Resource Caregivers] are Caucasian and [Child] is not is not a reason to justify relief under Rule 60(b)(6), Hawaii Family Court Rules. In the Matter of J.N., 158 Misc.2d 97, 601 N.Y.S.2d 215 (Family Court of New York, New York County 1993).

22. [AM] has not presented any other reason that would justify relief under Rule 60(b)(6), Hawaii Family Court Rules.

23. It is not in [Child]'s best interests to grant a motion to set aside default at this point in the case.

24. [AM]'s Motion to Set Aside Default has not been brought within a reasonable time after the Default was entered.

25. [AM]'s Motion to Set Aside Default has not been brought within a reasonable time after termination of [AM's] parental rights.

26. [AM] has not presented reasons that would justify a claim for relief under Rule 60(b), Hawaii Family Court Rules.

27.  With regard to Rule 55(c), Hawaii Family Court Rules, a motion to set aside a default must show (1) that the non-defaulting party will not be prejudiced by the reopening; (2) that the defaulting party has a meritorious defense; and (3) that the default was not the result of inexcusable neglect or a willful act on the part of the moving party.  BDM, Inc., v. Sageco, Inc., 57 Haw. 73, 549 P.2d 1147 (1976).

28.  [Child] is a party to this proceeding. HRS §[ ]587A-4.

29.  [Child] would be prejudiced by reopening the case because (1) he has been in foster care for approximately 3 years and he is entitled to permanency and closure[ ](In the Interest of T Children, 113 Haw. 492, 499, 155 P.3d 675, 682 (App. 2007)); (2) Mother and [AM] are not presently able to provide a safe family home for [Child], even with the assistance of services; (3) there is no indication when, or if, [AM] would be able to provide a safe family home for [Child] if the default were to be set aside; (4) [Child] is strongly bonded to [Resource Caregivers] just as they are to him; (5) [Child] is not bonded to Mother or [AM]; (6) [Child] is thriving in his current placement' and (7) there are no compelling reasons documented in the record that would justify preventing [Child] from permanency and closure.

30.  [AM] does not have a meritorious defense to the default.

31.  [AM] has not shown good cause to set aside the default or the termination of his parental rights as required by Rule 55(c), Hawaii Family Court Rules.

32.  [AM] has not satisfied the requirements of Rule 60(b) or Rule 55, Hawaii Family Court Rules.

33.  The default and the subsequent termination of parental rights was the result of inexcusable neglect on the part of [AM].

We hold that the family court's conclusions of law were correct, Fisher, 111 Hawaiʻi at 46, 137 P.3d at 360; to the extent they presented mixed questions of fact and law, they were not "clearly erroneous," were supported by the trial court's findings of fact, and reflected an application of the correct rule of law.  Klink, 113 Hawaiʻi at 351, 152 P.3d at 523.

### 3.  **AM Was Not Denied Due Process.**

AM argues that the family court's denial of his motion to intervene violated his "due process rights."  AM had been

defaulted before he moved to intervene, and a default judgment was entered. AM had to have both his default and the default judgment set aside before he could have standing to intervene. The family court conducted a 2-day evidentiary hearing on AM's motion to set aside the entry of his default and the default judgment. As was discussed above, the family court did not err in declining to set aside the entry of default or the default judgment. We hold that AM was not deprived of due process.

AM argues that Judge Uale violated the "law of the case" when he set aside the per diem judge's approval of the parties' stipulation to allow AM to intervene. It is true that in cases upon which more than one judge has presided, "the usual practice of courts to refuse to disturb all prior rulings in a particular case" is referred to as the "law of the case[.]" Chun v. Bd. of Trs. of Emps.' Ret. Sys., 92 Hawaiʻi 432, 441, 992 P.2d 127, 136 (2000) (citation omitted). "Unless cogent reasons support the second court's action, any modification of a prior ruling of another court of equal and concurrent jurisdiction will be deemed an abuse of discretion." Wong v. City & Cty. of Honolulu, 66 Haw. 389, 396, 665 P.2d 157, 162 (1983) (citations and emphasis omitted). The law of the case doctrine

> does not, however, have the inexorable effect of res judicata and does not preclude the court from reconsidering an earlier ruling if the court feels that the ruling was probably erroneous and more harm would be done by adhering to the earlier rule than from the delay incident to a reconsideration and the possible change in the rule of law to be applied. In fact, it has been noted that, so long as a trial court retains jurisdiction, it always has the power to reexamine, modify, vacate, correct and reverse its prior rulings and orders.

Chun, 92 Hawaiʻi at 441, 992 P.2d at 136 (cleaned up) (citations omitted).

In this case, Judge Uale had "cogent reasons" to set aside the per diem judge's ruling because AM failed to set aside his default, or the judgment terminating his parental rights, before moving to intervene. Judge Uale did not abuse his

22

discretion by vacating the per diem judge's order allowing AM to intervene while AM was still in default.

## CONCLUSION

For the foregoing reasons, the "Decision and Order Regarding the Contested Hearing on [AM]'s Motion to Set Aside Default Filed June 5, 2019[,]" is affirmed.

Dated:  Honolulu, Hawaiʻi, September 29, 2020.

On the briefs:

Georgia K. McMillen,
for Appellant AM.

Clare E. Connors,
Nara E. Sitachitta,
Julio C. Herrera,
for Petitioner-Appellee
Department of Human Services.

Francis T. O'Brien,
for Appellees-Intervenors Resource Caregivers.

Shelby N. Ferrer,
for Appellee Court Appointed
Special Advocates Program.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Derrick H.M. Chan
Associate Judge

/s/ Keith K. Hiraoka
Associate Judge